Sebastian L. Miller (SBN 265793)
sebastian@sebastianmillerlaw.com
SEBASTIAN MILLER LAW, P.C.
900 Lafayette Street, Suite 201
Santa Clara, CA 95050
Telephone: 408.348.1728
Facsimile: 408.716.3149

Attorneys for Plaintiff
ANNETTE BRUCE

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| ANNETTE BRUCE,<br><br>        Plaintiff,<br><br>v.<br><br>DEL MONTE FOODS, INC.,<br><br>        Defendant. | Case No. 16-cv-05891-JD<br><br>**DECLARATION OF SEBASTIAN L. MILLER IN SUPPORT OF PLAINTIFF'S MOTION FOR PAYMENT OF ATTORNEY'S FEES, LITIGATION COSTS, AND NAMED PLAINTIFF ENHANCEMENT**<br><br>**Date: April 26, 2018**<br>**Time: 10:00 a.m.**<br>**Courtroom 11, 19th Floor** |

I, Sebastian L. Miller, am counsel of record to Plaintiff Annette Bruce ("Ms. Bruce" or "Plaintiff") in this action against Defendant Del Monte Foods, Inc. ("Del Monte").  I make this declaration in support of Plaintiff's motion for payment of attorney's fees and litigation costs and a $1,000 enhancement payment to Ms. Bruce from the settlement of her claims under the Labor Code Private Attorneys General Act of 2004 ("PAGA").

### SUMMARY OF PLAINTIFF'S ATTORNEY'S FEES AND COSTS

1.      I am the attorney who handled this litigation on Plaintiff's behalf.  I represented Plaintiff on a pure contingent-fee, costs-advanced basis.  My work began in July 2016.  I contemporaneously tracked all the time I spent on this matter as well as the costs that I incurred

on Plaintiff's behalf.  I tracked my time and expenses using software called Freshbooks.  A true and correct copy of all the time I entered in Freshbooks for Plaintiff's matter is attached as Exhibit A to this declaration.

2.     Exhibit A shows that I spent over 590 hours working on this case between July 2016 and March 19, 2018.  I believe that 590 hours understates the actual number of hours that I spent thinking about Plaintiff's case and strategizing on her behalf.  I believe the actual number is over 650 hours but that I simply forgot to bill time or decided not to bill certain phone calls and other time that was spent on the matter while I was out of the office.

3.     A true and correct copy of all the costs that I believe I incurred on Plaintiff's behalf is attached as Exhibit B to this declaration.  As of March 19, 2018, I had incurred actual out-of-pocket costs of at least $13,322 to litigate Plaintiff's case.  I contend that all the costs described on Exhibit B are reasonable costs.  Nevertheless, I am only seeking reimbursement for $12,000 in costs, which is less than the sum of the following large costs (or categories of costs): the initial case filing fee ($400), an expert fee ($3,750), a mediator's fee ($7,000), and travel costs for four trips to Hanford to meet with my clients and three trips to San Francisco ($1,000).

4.     My regular, non-contingent hourly rate is $425 per hour.  I routinely bill many fee-paying clients this amount.  I am routinely paid $425 per hour by many of my clients.  I do about 20% of my work for fee-paying clients and I charge virtually all of them $425 per hour.  Although I do about 80% of my work on a contingent-fee basis, I think $425 is a reasonable approximation of the amount of money that I make for every hour that I work on a contingent-fee matter.  While some contingent cases result in hourly compensation that exceeds $425 and others result in a lower amount, I think $425/hour approximates my average compensation on contingent work.

5.     If the Court uses the "lodestar method" to set my attorney's fees, I believe that my current lodestar is $250,750 (590 hours * $425 per hour).  After a close review of the time entries on Exhibit A to this declaration, I believe that fewer 100 hours were spent on tasks that were totally unrelated to Plaintiff's claims under PAGA.  That is, fewer than 100 hours were spent

exclusively on Plaintiff's claims under the Fair Employment and Housing Act ("FEHA") and the Age Discrimination and Employment Act ("ADEA"). So, even if 100 hours are excluded from lodestar hours, my lodestar fees are still $208,250 (490 hours * $425 per hour).

6.      Based on my prior experience with the settlement of many other class and representative actions, I believe that after today I will spend at least another 50 hours working on Plaintiff's case. I will spend additional time preparing for and participating in a hearing on the instant motion. In addition, if the motion is approved, I will spend time communicating with a settlement administrator, employees who receive settlement checks and opposing counsel

7.      Thus, by the time the case is completely closed, I will have spent at least 540 hours working strictly on Plaintiff's PAGA case. The lodestar fees would, therefore, be at least $229,500 (540 hours * $425 per hour)

## FACTS SUPPORTING PLAINTIFF'S ATTORNEYS FEES AND COSTS

8.      I graduated from The University of Chicago Law School in 2008. I have practiced employment law and commercial litigation since then.

9.      My first job as a lawyer was as an Associate in the New York office of Dewey & LeBoeuf LLP ("Dewey") in September 2008. At Dewey's New York office, I worked on a variety of matters and my billing rate was between $250 and $450, depending on the client and the matter. I am admitted to the New York bar.

10.      After one year in New York, I transferred to Dewey's office in Silicon Valley. I took and passed the State of California's bar examination and was admitted to the bar in California in December 2009. I have practiced in California continuously since 2009.

11.      Almost immediately after joining Dewey's Silicon Valley office, I began focusing on commercial and employment litigation. I practiced at Dewey's Silicon Valley office until April 2012. I believe my billing rate at Dewey was between $300 and $650, depending on the client and the project.

12.      At Dewey, I primarily defended corporate clients in class action and single plaintiff

DECLARATION ISO PAYMENT OF ATTORNEY'S FEES, COSTS, AND NAMED PLAINTIFF ENHANCEMENT

litigation.  I defended a class action against a subsidiary of Sedgwick Claims Management that alleged certain insurance adjusters had been misclassified as exempt from overtime.  The complex department of the Los Angeles Superior Court ultimately granted defendant's affirmative defense of exemption from overtime.  I also defended a subsidiary of Fidelity National Financial in a class action that alleged fraud, misrepresentation, breach of fiduciary duties and other claims related to 1031 exchange company (Case No. 3:10-cv-05336) (N.D. Cal.).  That case ultimately settled and the settlement was approved by Judge Jeffrey S. White.  In addition, I represented more than a dozen other defendants and plaintiffs in employment lawsuits and arbitrations.

13.     About two weeks before Dewey ceased operations and fired all its attorneys, I took a job at the Silicon Valley office of Goodwin & Procter LLP ("Goodwin").  I worked at Goodwin from April 2012 until May 2014.  At Goodwin, I focused exclusively on employment litigation and counseling.  I primarily represented startups and venture capital funds.  My billing rate was between $425 and $615, depending on the client and the matter.  My rate at Goodwin was higher than the rate I currently charge, even though I now have more legal experience.

14.     At Goodwin, I defended many employment law class actions.  Two significant class actions were *Marchelos v. Reputation.com, Inc.*, Case No. 12-CV-01899-YGR (N.D. Cal.) ("Marchelos") and *Pasillas v. Agility Fuel Systems, Inc.*, Case No. 30-2014-00701465-CV-OE-CXC, Orange County Superior Court ("Pasillas").  Marchelos alleged that certain employees were improperly classified as exempt from overtime and therefore were owed wages and premium payments from missed meal and rest periods and various penalties.  Marchelos settled after discovery and mediation.  The settlement was approved by Judge Gonzalez Rogers.  Pasillas alleged that certain employees at an equipment manufacturer were denied meal and rest breaks and were therefore owed meal and rest period premiums and various penalties.  It also settled after discovery and mediation and the settlement was approved by Judge Gail A. Andler.  Both Marchelos and Pasillas included PAGA claims that were settled.

15.     I resigned from Goodwin around May 2014 to take a position at the Silicon Valley

office of DLA Piper LLP (US) ("DLA").  I resigned from DLA in December 2014 to start my own firm and represent plaintiffs.  During my brief tenure at DLA, my work focused exclusively on employment litigation and counseling.  To the best of my recollection, my billing rate at DLA was between $425 and $675, depending on the client and the matter.  I worked on a class action called *Galeener v. Source Refrigeration & HVAC, Inc.*, Case No. 3:13-cv-04960 ("Galeener"), that was pending before Judge Chhabria.  I also worked on other, related class actions and unrelated single-plaintiff cases.  The Galeener case raised issues related to the fluctuating work week method of compensating refrigeration technicians as well as claims under PAGA.

16.     I began working at Sebastian Miller Law, P.C. ("Miller Law") as soon as I resigned from DLA in December 2014.  My work at Miller Law focuses exclusively on employment law.

17.     From approximately December 2014 until December 2015, I spent about 60% of my time at Miller Law doing contingent-fee litigation, 20% of my time doing defense-side or hourly-fee litigation, and 20% of my time doing hourly-fee counseling work for startups (drafting policies, addressing employee grievances, etc.) and negotiating employment agreements on behalf of wealthier individuals who can could afford to pay my hourly rate.  During that period, I charged an hourly rate of $350.  I believe my collections on hourly-fee matters were greater than 95% but less than 100% of total hours billed.

18.     Around January 2016, I increased my hourly rate to $395.  Between January 2016 and October 31, 2017, I spent about 80% of my time doing contingent-fee employment litigation and 20% of my time doing hourly counseling working for startups and individuals.  I stopped doing any defense-side litigation in late 2017.

19.     Between January 2016 and October 2017, I estimate that I have billed about 700 hours to clients at the hourly rate of $395.  I believe my collections on hourly cases was greater than 97% but less than 100% of total hours billed.  I believe that I could take on more hourly matters, either from startups or individuals, including defense-side litigations, but I have made a conscious effort to focus on plaintiff-side, contingent cases.  My current hourly-fee clients include

eryr

1   the following companies: Cohesity, Inc., InfluxData, Inc., MatterMost, Inc., ProsperWorks, Inc.,

2   and RingCentral, Inc.  They also include many "executives" and other individuals who have the

3   financial resources to pay $425 per hour for my time.  At various times, many of these companies

4   and individuals has offered me more work but I have often had to turn them down because I was

5   too busy with contingent-fee cases, including Plaintiff's.

6       20.     On November 1, 2017, I increased my hourly rate to $425.  Between November 1,

7   2017 and the present, I have charged many clients this rate and I have collected at least one

8   hundred billable hours of invoices that were sent at this rate.  However, my focus has continued to

9   be contingent-fee litigation.

10      21.     At Miller Law, I have handled one class action and a few different PAGA actions.

11  I represented the plaintiff in a class action that alleged violation of Labor Code § 2802 and PAGA

12  related to an employer's failure to reimburse its employees for using their personal, cellular

13  phones to perform their jobs – *Ables v. The Energuy, Inc.*, Case No. 34-2016-00189107

14  (Sacramento Superior Court) ("Ables").  The Ables case settled on a class-wide basis following

15  discovery and the settlement was approved by Judge David I. Brown.  I also represented the

16  Plaintiff in *Mixson v. Fitness International, LLC*, Case No. BC605681 (Los Angeles Superior

17  Court) ("Mixson") which alleged similar claims to Ables.  Mixson settled only as to the named

18  plaintiff and that settlement was approved by the Court.

19      22.     My significant non-class cases at Miller Law include the following:

20      •     I represented an individual in an employment arbitration at JAMS where

21  Hon. Wayne D. Brazil (Ret.) served as the arbitrator.  The case alleged retaliation in

22  violation of Labor Code § 1102.5(b).  Following a four-day arbitration hearing in July

23  2017 that included testimony from more than a dozen witnesses, Judge Brazil issued an

24  opinion finding in favor of my client on her retaliation and wrongful termination claims

25  and that set a briefing schedule for an attorney fee motion.  The case settled before the fee

26  motion was decided.

27

28

- I represented an individual in an employment arbitration at JAMS before Hon. Robert A. Baines (Ret.) that alleged failure to accommodate a disability in violation of FEHA.  Following a three-day arbitration hearing in October 2017 that included testimony from eight witnesses, Judge Baines issued an opinion finding in my client's favor on his FEHA claims and setting a briefing schedule for an attorney fee motion.  The case settled after this opinion was issued.

- I represented a tenured professor at the University of California, Riverside ("UCR") in a day-long hearing before UCR's faculty Committee on Privilege and Tenure ("P&T").  After hearing testimony from about ten witnesses, the P&T committee issued Findings and Recommendations that adopted my client's position in full and UCR's Chancellor ultimately followed those recommendations.  My client paid me $350 per hour.

- I represented two former employees of a large public company called FleetCor Technologies, Inc. in a dispute over stock options that proceeded in the United States District Court for the Northern District of California (Case No. 16-CV-00135-LHK).  The case was actively litigated until a few weeks before trial.  At the final pretrial conference, Judge Koh granted three of the plaintiffs' five motions *in limine* and denied all ten of FleetCor's motions *in limine*.  The case resolved shortly thereafter.

23.     I have represented at least fifty different clients in litigations, arbitrations and administrative matters that have settled before a trial or a hearing.  Many of these cases involved the successful defense of a motion for summary judgment or summary adjudication and others involved the filing of motions in limine in superior court shortly before trial.

24.     I have recovered over $6,000,000 in funds and benefits for clients since starting Miller Law in December 2014.  I was named a "Rising Star" in the field of employment litigation and have been recognized by other services that rank and rate lawyers.

## SUMMARY OF LITIGATION

25.     In July 2016, a few individuals who worked at Del Monte's plant in Hanford (the

DECLARATION ISO PAYMENT OF ATTORNEY'S FEES, COSTS, AND NAMED PLAINTIFF ENHANCEMENT

"Plant") contacted me about a practice Del Monte applied during the annual tomato processing season (the "Season").  This practice required employees to work seven days a week for many weeks or months for the duration of the Season.  The employees were concerned that this practice violated California's day of rest statutes—Labor Code §§ 551-552.  I had previously published an article on this topic and posted various other materials on the internet.  A true and correct copy of the article I published in the Daily Journal is attached as Exhibit C to this declaration.

26.     I decided to represent Plaintiff Annette Bruce and five other individuals regarding a claim that Del Monte's scheduling practice did violate the law.  In July and August 2016, I conducted factual research regarding Del Monte's collective bargaining agreements with Teamsters Local 948 ("Local 948"), legal research regarding the California Labor Code's day of rest statutes, and I traveled to Hanford to meet with my clients who worked at the Plant.   I drafted and sent a detailed letter to the California Labor & Workforce Development Agency ("LWDA") that described the theory underlying Plaintiff's alleged PAGA violations.  I also provided Del Monte with notice of Plaintiffs' intent to bring claims against Del Monte.

27.     PAGA, as amended, provides for a sixty-day period during which the LWDA can investigate a claim for violation of the statute and the ability to file litigation is tolled during this period.  The LWDA did not contact me regarding Ms. Bruce's case during this sixty-day period.  It is my experience that the LWDA rarely, if ever, intervenes in cases at the notice stage and it rarely, if ever, even contacts the lawyers who file notices of PAGA violations.  Indeed, the LWDA website includes statements to this effect.  Since the LWDA did not intervene in and Del Monte had not corrected the alleged violations, my next step was to file a lawsuit against Del Monte.

28.     To prepare the lawsuit, I requested that Del Monte provide me with my clients' personnel records.  They were about three thousand pages long.  I reviewed these records to confirm that they each person had standing to pursue claims under PAGA related to the day of rest statutes and for various other reasons.  I also had many calls with my clients and counsel for Del Monte.  I traveled to Hanford and met with clients.  I then spent dozens of hours drafting a

detailed complaint for violations of PAGA, FEHA and the ADEA.  I ensured that the underlying theory could proceed notwithstanding Del Monte's claim that a collective bargaining agreement ("CBA") with Local 948 precluded the claim.  Before filing the complaint, I had conversations with at least eight people who worked at the Plant.  Ms. Bruce was involved in this investigation and in these calls.  I also secured notices of right to sue for all of my clients.

29.     This case proceeded under a very novel legal theory.  I am not aware of another case where plaintiffs alleged violations of PAGA against a unionized employer related to violations of the day of rest statutes.  Further, at the time this case was filed, the California Supreme Court had not issued the opinion in *Mendoza v. Nordstrom, Inc.*, which defined what the term "cause" means as it is used in Cal. Labor Code §§ 551-552.  If *Mendoza* had defined "cause" narrowly, then the theory of violations that underlies this case would not have had legal viability.  Fortunately for Plaintiff, the *Mendoza* case came out in May 2017 and defined "cause" broadly.

30.     After the complaint was filed, I engaged in some informal discussions with Del Monte's counsel.  I was informed by Del Monte's lawyers that the company intended to vigorously defend the case and that it would file a motion to dismiss it.

31.     In November and December 2016, I devised a discovery and trial plan for the case that focused on how I would prove both the existence of a common policy that caused Del Monte to violate the day of rest statutes during the Season as well as disparate impact related to the scheduling practices.  The intent was to eliminate any defenses to the case related to manageability or individualized issues.  I drafted written discovery requests on Del Monte and a subpoena on Local 948 that were intended to support these claims.  I also traveled to Hanford to meet with my clients and draft thorough initial disclosures.

32.     In January 2017, the parties completed their case planning conference under FRCP 26.  The parties drafted a detailed joint case management statement.  In that statement, I included a discovery and class certification plan, among other things.

33.     Immediately thereafter, I served dozens of requests for production of documents

DECLARATION ISO PAYMENT OF ATTORNEY'S FEES, COSTS, AND NAMED PLAINTIFF ENHANCEMENT

(FRCP 34) on Del Monte and many interrogatories (FRCP 33).  I also served a subpoena on Local 948.  My clients previously attempted to get certain documents from Local 948, but its representatives repeatedly told them that Local 948 would not provide them with any materials without a subpoena and that it was disappointed that my clients were involved in litigation.  Subsequently, I spent many hours meeting and conferring with Local 948's attorneys about the subpoena.

34.     In January 2017, Del Monte moved to dismiss the disparate impact claims under FRCP 12.  The motion sought to dismiss the ADEA and FEHA claims with prejudice and asked that the PAGA claims be dismissed for lack of supplemental jurisdiction.  I spent dozens of hours researching and briefing Plaintiffs' opposition.  I attended a hearing on the motion.  Following that hearing, the Court gave Plaintiffs' leave to amend to the complaint to add more factual allegations.

35.     Thereafter, I traveled to Hanford to develop more factual allegations.  During this period, I spoke and met with many of the named plaintiffs, including Ms. Bruce.  I then filed a first amended complaint ("FAC").  The FAC alleged the same claims as the initial complaint but included more underlying factual allegations.

36.     Del Monte asked for two extensions of time to respond to the FAC.  I stipulated to those extensions.  Del Monte ultimately chose to file an answer.  Del Monte's lawyers advised me that their client would file a motion for summary judgment but would be amenable to mediation beforehand.

37.     The parties stipulated to private mediation before Mark Rudy, Esq.  Mr. Rudy is regarded as one of the premier employment class action mediators in Northern California.  His daily rate to conduct a mediation is $14,000.  This is a very high amount.  It certainly reflects both the level of trust people place in him as well as the demand for his services.

38.     Prior to the mediation, I received formal discovery responses from Del Monte and a document production that exceeded 4,000 pages.  I also received an informal production of time records and other documents from Del Monte.  This informal production allowed me to complete a disparate impact analysis regarding Plaintiffs' ADEA and FEHA claims.  It also allowed me to calculate economic damages and determine what Del Monte's maximum liability for PAGA

penalties would be. I did this by creating a damages spreadsheet. By obtaining the data I needed to create these spreadsheets in an informal manner, I saved hundreds—if not thousands—of hours of attorney time and tens—if not hundreds—of thousands of dollars in costs that could have been necessary if Plaintiff was required to reverse engineer these spreadsheets via documents obtained from formal discovery.

39.    Based on the time swipe records that Del Monte created, I was able to calculate Del Monte's maximum exposure for PAGA penalties. To do this, I secured assistance from an expert. The spreadsheet that Del Monte provided included time swipes from over one thousand employees. The data showed that most employees swiped in and out of work at the Plant hundreds of times over a two-year period. Since they were so voluminous, I could not manually review these records. To be more efficient, I engaged Richard Drogin, PhD to create a spreadsheet that consolidated Del Monte's time records and that also organized them in a more accessible way. Essentially, Dr. Drogin created a row for each Plant employee that showed the number of weeks the particular employee worked seven consecutive days between August 2015 and April 2017. Dr. Drogin sent me a bill for $3,750 for his efforts and I paid the bill that he sent along.

40.    In addition, I evaluated Plaintiffs' disparate impact claims using the following documents that Del Monte provided informally: employee census data, spreadsheets regarding suspensions and discharges related to attendance points, and spreadsheets regarding the age of employees who retired and resigned during 2015, 2016 and 2017. The census data showed that the overall employee population skewed older at the Plant. Nearly seventy percent of the workforce was over the age of forty. Many employees in their fifties and sixties. Whether over or under forty, relatively few workers were suspended or discharged for accruing too many attendance points. Out of more than 1,000 employees, fewer than fifteen had been fired due to accrual of attendance points. Further, when age groups were compared, a greater percentage of younger workers (relative to their overall population within the Plant) had been fired for accruing too many attendance points as compared to workers over the age of forty. This undercut

Plaintiffs' theory of disparate impact.  Similarly, there were only about twenty attendance-related suspensions overall and there was not any significant difference between the frequency that employees over and under the age of forty were suspended.  Again, this undercut the disparate impact theory.  Finally, I compared the data on employees' ages at the time they retired or quit to some overall labor market data regarding the age that workers who have similar packing jobs generally retire.  My analysis suggested that employees at the Plant were retiring or quitting at an older (as opposed to younger) age than one would expect.  This sort of longevity in employment at the Plant undercut the theory that the attendance policies were so onerous that they caused employees to prematurely quit their jobs.

41.    The data that Del Monte produced rebutted Plaintiffs' disparate impact theory. Since so few employees were suspended, fired or forced to resign due to the attendance policies, and because there was not a statistically relevant difference between the way older and younger workers were affected, there was virtually no way to prove that the attendance policies caused economic loss or any other concrete, adverse employment actions of the attendance policies.

**SUMMARY OF MEDIATION AND SUBSEQUENT SETTLEMENT DECISION**

42.    The parties completed a one-day mediation in San Francisco on July 20, 2017. Before the mediation, I spent scores of hours drafting a mediation statement that included nearly twenty pages of text and hundreds of pages of exhibits.  The mediation statement focused exclusively on the PAGA claim.  It included a road map—via discovery and motions—to have liability on the PAGA claim decided at the summary judgment stage and to then try damages (penalties) under PAGA via expert declarations regarding days worked.  I traveled to Hanford to meet with my clients to discuss all of this and to prepare for the mediation.

43.    The mediation proceeded with exchanges of monetary demands and offers as well as information that the Mark Rudy brought back and forth between the different parties.  My takeaway from the mediation was that Del Monte recognized that discovery could be expensive but that it believed strongly in its position on the merits.  Therefore, it was only willing to spend

money on a settlement if it could get certainty regarding the level of penalties that would apply if employees worked seven days per week during the Season.

44.     At the mediation, I ultimately recommended to my clients that they accept a settlement offer whereby Del Monte would pay a fixed penalty for each week that an employee worked all seven days between August 2015 and October 2017.  Del Monte agreed that there were 10,107 such weeks between August 2015 and April 21, 2017 and estimated that there would be about 5,000 more weeks between May and October 2017.  The penalty would be roughly $60 per pay period and, therefore, it was contemplated that the total settlement would be for about $900,000.  In addition, the proposed settlement would also provide for an individual payment of $2,000 to each plaintiff who agreed to settle and dismiss with prejudice his or her individual ADEA and FEHA claims.  Finally, subject to court approval, the settlement provided for a $1,000 enhancement payment to each of the named plaintiffs.  My clients were initially supportive of this arrangement when it was proposed at the mediation.

45.     After the mediation, I negotiated a written settlement memorandum with Del Monte's counsel.  I signed that memorandum and so did Ms. Bruce.  However, the other five named plaintiffs were ultimately unwilling to sign a settlement memorandum.

46.     The prevailing sentiment among the named plaintiffs who did not sign the settlement was that it was unfair that they would receive only a small part of the total settlement funds.  They did not want to split the funds with the LWDA or the other aggrieved employees.  They also stated that other employees at the Plant verbally accosted them based on the claim that their theory of their case putting at risk Del Monte's practice of scheduling employees to work daily overtime during that Season.

47.     They did not want Ms. Bruce to sign the settlement.  After much back and forth, which included my making two trips to Hanford, the five named plaintiffs made a final decision not to sign the proposed settlement or be bound by a standard class-wide distribution of funds.  Instead, they agreed to dismiss their claims without prejudice.  Del Monte stipulated to this

request and the court approved this stipulation.  The final, long-form settlement agreement was signed just by Ms. Bruce, Del Monte and the parties' lawyers in September 2017.

48.     After the settlement agreement was signed, Del Monte provided me with information that showed how many weeks a given Plant employee worked all seven days during the 2017 tomato processing Season (April-October 2017).  The parties then agreed on the total number of alleged PAGA violations and the total settlement payment of $904,872.

49.     Thereafter, I spent dozens of hours drafting a motion, declaration and related papers that sought approval of the PAGA settlement.  I discussed these with Del Monte ahead of time, per the settlement agreement's requirement that I do so.  After these documents were filed, I uploaded the documents to the LWDA's website and traveled to San Francisco to attend a hearing on the motion.  After the hearing, I filed an update with the Court that the LWDA had not contacted either party regarding the settlement.

50.     On March 13, 2018, the Court issued an Order that directed plaintiff to file a separate motion for attorney's fees, costs and enhancement payments.  I spoke with opposing counsel before and after this Order was issued.  I have filed the instant motion and related papers in response to the Court's direction.

## REQUEST FOR NAMED PLAINTIFF ENHANCEMENT

51.     I believe that Annette Bruce should receive a $1,000 enhancement for her work on this case.  This modest enhancement is warranted for a few reasons.

52.     First, Ms. Bruce's name was the first one to appear on the case (*Bruce, et al. v. Del Monte Foods, Inc.*).  The matter was referred to as the "Bruce case" by all parties.  Ms. Bruce is currently employed by Del Monte and has worked at the company for the duration of the case.  Ms. Bruce reported to me that employees at the Plant questioned her about her involvement in this suit.  She also reported being concerned about the risk of retaliation from supervisors.  Suing a current employer necessarily creates an uncomfortable situation for any employee.

53.     Second, Ms. Bruce was responsive during this case.  She participated in many

telephone calls with me and she participated in multiple in-person meetings. Her involvement was time consuming and required her to incur some out of pocket travel costs to meet with me.

54.     Third, Ms. Bruce reported to me that she experienced some retaliation from her co-workers because she participated in the case. Her co-workers confronted her and stated that they believed her legal theory could cause Del Monte to change its scheduling policies in a way that would decrease the number of chances that employees would have to work overtime hours during the Season, thereby reducing their potential earnings.

55.     Fourth, Ms. Bruce made an independent judgment of the settlement's merits and decided that, consistent with her role as a class representative, she should sign the settlement even though she would not individually receive a substantial amount of money. Ms. Bruce vindicated PAGA's purposes by honoring her obligations as a representative plaintiff in a PAGA case. By acting in the best interest of all parties, Ms. Bruce allowed the LWDA to receive a significant payment and allowed about $100 to be distributed to most of the other employees at the Plant.

56.     Fifth, Ms. Bruce received significant pushback from her co-plaintiffs regarding her decision to sign the settlement agreement. She told me that some of them confronted her at work and told her not to sign it. She had worked with many of her co-plaintiffs for twenty-five years, so her co-workers were friends, not just colleagues. She reported to me that some of the now-dismissed co-plaintiffs now refuse to talk to her at work.

57.     Last, by bringing the case, Ms. Bruce at least theoretically provided Local 948 with leverage when the current CBA expires in 2018. If Local 948 refuses to waive the day of rest statutes going forward, then Del Monte will incur substantial penalties if it schedules employees to work seven days per week during the 2018 Season. Or, if Local 948 elects to waive the day of rest statutes under Labor Code § 554, it can seek to likely obtain additional concessions for its membership for doing so.

## THE SETTLEMENT JUSTIFIES PLAINTIFF'S ATTORNEY FEES

58.     I took many risks in representing Ms. Bruce on a contingent-fee basis. I incurred

over $13,000 of expenses.  I risked losing those costs entirely.  I also spent more than five hundred hours working on a matter without any guarantee that I would ever receive any kind of payment.

59.     Second, unlike many plaintiff-side lawyers who exclusively litigate matters on a contingent-fee basis, I also represent many individuals and corporations on hourly-fee matters.  I turned away some paying matters to pursue Ms. Bruce's case, particularly during the months of January and June 2017.  One reason I turned away these fee-paying matters was that I believed I would receive a lodestar enhancement for my work on Ms. Bruce's case.

60.     Third, by taking Ms. Bruce's case on a contingent-fee basis, I deferred payment for all my time.  Even if I ultimately receive full compensation for all hours I worked and recover that sometime in June 2018, there will have been a delay of between one and twenty-three months between the date that I performed services for Ms. Bruce and the date that I received payment for my work.  This presents significant cash flow issues for a solo practitioner.

61.     The three reasons described above caused me to believe that my efforts would be recognized with a fee enhancement if Ms. Bruce prevailed.  They fit perfectly with the economic rationale for fee enhancement in contingency cases described in *Ketchum v. Moses*, 104 Cal.Rptr.2d 377, 384 (2001): (i) a contingent fee must be higher than a fee for the same legal services when an attorney is paid as the services are performed because the contingent fee compensates the lawyer not only for the legal services he renders but for the loan of those services and attendant risk of default or loss of a case; and (ii) a fee enhancement makes contingency cases economically feasible to competent private attorneys.

62.     Fourth, Ms. Bruce's case served a public interest in effectuating the purposes of PAGA.  The outcome of this case will make Del Monte more mindful of how it treats its employees and will give the LWDA money which it can use to educate workers.

63.     Fifth, Ms. Bruce's case will result in some funds—about $100—being distributed to all employees at the Plant who were employed during the relevant limitations period.

64.     Sixth, it will also give Local 948 with an opportunity to bargain for improved compensation via its next CBA with Del Monte or a guaranteed weekly day off for all employees in the coming years.

## MARKET RATE DATA ON ATTORNEY'S FEES

65.     I previously submitted a declaration in this case.  Dkt. No. 38-2.  Exhibits 3-1 through 3-4 to that earlier declaration were intended to substantiate that $425 is a reasonable rate for an attorney like me, who has ten years of post-law school experience, substantial subject matter expertise in employment law, and seven years of experience at top tier law firms.  Dkt. No. 38-2 at 42-113.

66.     Exhibits 3-1 and 3-4 to my prior declaration were quite lengthy so I have decided not to re-file them with this declaration.   The prior Exhibit 3-1 was a copy of a study by the National Law Journal that I condensed to show average billing rates for associates and counsel as well as high and low billing rates for partners at various firms.  *See*, Dkt. No. 38-2 at 43-69.  In that prior declaration, I highlighted a few firms that have large presences in the San Francisco Bay Area.  I believe that my skills and experience align with the individuals who hold the titles of senior associate, counsel and/or "junior" partner at these firms.  I believe my rate of $425 is generally below what these firms charge for lawyers with those titles.  If I currently worked at one of those firms, I believe I would currently have one of those titles and the billing rate that is associated with it.  I have that belief because I am in touch with my former colleagues and they have told me what billing rates they charge.

67.     Exhibit 3-4 to the prior declaration was a copy of a declaration that an expert on attorney's fees—Richard Pearl, Esq.—that was prepared for another case roughly two and a half years ago.  *See*, Dkt. No. 38-2 at 79-113.  I believe that paragraphs 12-14, which summarize Mr. Pearl's conclusions regarding prevailing market rates for attorneys' fees in San Francisco in 2014 and 2015 and are based on published court orders and surveys, confirm that a rate of $425 is less than what lawyers with comparable experience to me charge in the San Francisco Bay Area.

68.     Attached as Exhibit D to this declaration is a copy of the current Laffey Matrix to which many courts look when considering what a reasonable billing rate is.  The Laffey Matrix suggests that $636 per hour is a reasonable rate for an attorney in the Washington D.C. area with 8-10 years of experience.  The comparable rate in the San Francisco Bay Area is slightly higher than $636 because the cost of living in the Bay Area is higher than the cost of living in Washington D.C.

69.     Attached as Exhibit E to this declaration is an article that was written in 2015 regarding different indicia of reasonable rates in the San Francisco Bay Area.  The article asserts that the "Real Rate Report" showed that the mean partner billing for labor and employment work in San Francisco was between $286 and $720 per hour (depending on firm size) and the mean associate billing rate was between $250 and $468 (again, depending on firm size).  The article ultimately concludes that $344 was the average billing rate for an employment case in San Francisco being handled by an attorney with 8-10 years of experience in 2014.  Based on my conversations with other attorneys, I believe that these rates have increased by at least 10% since the data was collected in 2014.  I also believe this data skews low because so much defense work in the employment law area is done by firms that are paid by employment practices liability insurance policies ("EPLI").  Low billing rates are a feature, not a bug, of EPLI defense work.

I declare under penalty of perjury that the foregoing is true and correct.  This declaration was executed on March 19, 2018 in Carmel, California.

/s/      *Sebastian L. Miller*
Sebastian L. Miller

# **EXHIBIT A**

# Timesheet Details by Team

Sebastian Miller Law, P.C.

Between June 01, 2016 and March 19, 2018

| | Client | Project | Task | Notes | Hours | Billed |
|---|---|---|---|---|---|---|
| **Miller, Sebastian** | | | | | | |
| 07/27/16 | Annette Bruce | Del Monte Action | General | Meet with clients (Raymond and Brian); research labor code 552; read collective bargaining agreement; review evidence from client; outline potential complaint | 5.70 | |
| 07/29/16 | Annette Bruce | Del Monte Action | General | Attention to engagement letter; research statutes of limitation | 2.90 | |
| 08/01/16 | Annette Bruce | Del Monte Action | General | Correspond with client | 0.40 | |
| 08/02/16 | Annette Bruce | Del Monte Action | General | Review documents from client; outline litigation claims; conversations with client | 3.90 | |
| 08/04/16 | Annette Bruce | Del Monte Action | General | Correspond with client; draft LWDA notice | 3.30 | |
| 08/05/16 | Annette Bruce | Del Monte Action | General | Draft portions of DFEH and LWDA claims | 2.90 | |
| 08/06/16 | Annette Bruce | Del Monte Action | General | Finalize PAGA and DFEH letters; file complaints with LWDA and DFEH; serve notices of violations and notices of right to sue | 2.90 | |
| 08/09/16 | Annette Bruce | Del Monte Action | General | Correspond with client; attention to notices of right to sue | 1.80 | |
| 08/16/16 | Annette Bruce | Del Monte Action | General | Correspond with client and opposing counsel; serve notices of right to sue; review collective bargaining agreement | 1.20 | |
| 08/22/16 | Annette Bruce | Del Monte Action | General | Correspond with clients; secure notice of right to sue for Annette Bruce | 2.10 | |
| 08/25/16 | Annette Bruce | Del Monte Action | General | Send letter to Local 948; review preemption case law | 1.80 | |
| 08/30/16 | Annette Bruce | Del Monte Action | General | Correspond with clients | 0.30 | |
| 09/06/16 | Annette Bruce | Del Monte Action | General | Correspond with clients and opposing counsel | 0.80 | |
| 09/21/16 | Annette Bruce | Del Monte Action | General | Correspond with counsel for Local 948 | 1.10 | |
| 09/22/16 | Annette Bruce | Del Monte Action | General | Research and draft portions of complaint; review payroll records | 3.30 | |
| 09/23/16 | Annette Bruce | Del Monte Action | General | Draft portions of complaint | 2.20 | |
| 09/26/16 | Annette Bruce | Del Monte Action | General | Confer with opposing counsel and client | 0.90 | |
| 09/27/16 | Annette Bruce | Del Monte Action | General | Research and draft portions of complaint | 8.90 | |
| 09/28/16 | Annette Bruce | Del Monte Action | General | Attention to complaint | 5.10 | |
| 09/29/16 | Annette Bruce | Del Monte Action | General | Revise complaint; revise discrimination charges; travel to Hanford; meet with clients in Hanford; travel home | 11.90 | |
| 09/30/16 | Annette Bruce | Del Monte Action | General | Send correspondence to EEOC; finalize discrimination charges; correspond with clients; review evidence from clients | 3.30 | |
| 10/03/16 | Annette Bruce | Del Monte Action | General | Correspond with EEOC and clients | 1.40 | |
| 10/05/16 | Annette Bruce | Del Monte Action | General | Call with EEOC; revise lawsuit | 4.40 | |
| 10/06/16 | Annette Bruce | Del Monte Action | General | Attention to complaint | 5.80 | |
| 10/07/16 | Annette Bruce | Del Monte Action | General | Attention to complaint and EEOC notice of right to sue | 2.70 | |
| 10/10/16 | Annette Bruce | Del Monte Action | General | Review employees' files and pay stubs; take notes | 3.90 | |
| 10/11/16 | Annette Bruce | Del Monte Action | General | Continue drafting the complaint | 5.90 | |

| | Client | Project | Task | Notes | Hours | Billed |
|---|---|---|---|---|---|---|
| 10/11/16 | Annette Bruce | Del Monte Action | General | Review and revise complaint; proofread complaint | 3.30 | |
| 10/12/16 | Annette Bruce | Del Monte Action | General | Finalize initial pleadings; file with district court | 4.90 | |
| 10/12/16 | Annette Bruce | Del Monte Action | General | Review Judge Donato's standing orders; create waiver of service forms and other documents to send to opposing counsel; send chambers copy of complaint to Judge Donato; legal research | 3.30 | |
| 10/13/16 | Annette Bruce | Del Monte Action | General | Correspond with opposing counsel; serve case initiating documents | 3.30 | |
| 10/20/16 | Annette Bruce | Del Monte Action | General | Legal research at law library (disparate impact cases) | 4.30 | |
| 10/21/16 | Annette Bruce | Del Monte Action | General | File waiver of service; research certification issue | 1.90 | |
| 10/26/16 | Annette Bruce | Del Monte Action | General | Confer with client regarding additional plaintiffs | 0.40 | |
| 10/28/16 | Annette Bruce | Del Monte Action | General | Correspond with client; outline discovery strategy | 1.90 | |
| 11/16/16 | Annette Bruce | Del Monte Action | General | Draft requests for production; draft interrogatories; review clients' records; prepare for 26f conference | 4.90 | |
| 11/17/16 | Annette Bruce | Del Monte Action | General | Review case law on disparate impact; prepare discovery requests; prepare for motion to dismiss/amended complaint | 4.80 | |
| 12/05/16 | Annette Bruce | Del Monte Action | General | Correspond with opposing counsel | 0.60 | |
| 12/07/16 | Annette Bruce | Del Monte Action | General | Correspond with client and opposing counsel | 0.80 | |
| 12/08/16 | Annette Bruce | Del Monte Action | General | Correspond with clients and opposing counsel | 0.80 | |
| 12/12/16 | Annette Bruce | Del Monte Action | General | Attention to initial disclosures | 3.30 | |
| 12/12/16 | Annette Bruce | Del Monte Action | General | Outline subpoena to Local 948 | 1.10 | |
| 12/12/16 | Annette Bruce | Del Monte Action | General | Outline Joint CMC Statement | 0.90 | |
| 12/14/16 | Annette Bruce | Del Monte Action | General | Attention to discovery | 0.40 | |
| 12/16/16 | Annette Bruce | Del Monte Action | General | Draft discovery plan and staged litigation plan; prepare for CMC and 26(f) conference | 3.90 | |
| 12/19/16 | Annette Bruce | Del Monte Action | General | Attention to subpoena to Local 948 | 1.20 | |
| 12/26/16 | Annette Bruce | Del Monte Action | General | Prepare for Rule 26(f) conference | 4.30 | |
| 12/27/16 | Annette Bruce | Del Monte Action | General | Participate in Rule 26(f) conference; draft portions of joint case management statement; review and revise initial disclosures and discovery requests; review academic literature regarding effect of long working hours on older workers | 10.90 | |
| 12/28/16 | Annette Bruce | Del Monte Action | General | Travel to Hanford; travel from Hanford; meet with clients; outline discovery and litigation stategy | 12.90 | |
| 01/02/17 | Annette Bruce | Del Monte Action | General | Draft joint case management statement; draft discovery requests; speak with clients | 7.90 | |
| 01/04/17 | Annette Bruce | Del Monte Action | General | Correspond with client and opposing counsel; file ADR certification | 2.90 | |
| 01/04/17 | Annette Bruce | Del Monte Action | General | Serve discovery requests | 1.90 | |
| 01/05/17 | Annette Bruce | Del Monte Action | General | Correspond with clients and opposing counsel | 1.10 | |
| 01/06/17 | Annette Bruce | Del Monte Action | General | Correspond with clients and opposing counsel; attention to aging science | 3.30 | |

| | Client | Project | Task | Notes | Hours | Billed |
|---|---|---|---|---|---|---|
| 01/06/17 | Annette Bruce | Del Monte Action | General | Make revisions to Plaintiffs' initial disclosures | 7.80 | |
| 01/10/17 | Annette Bruce | Del Monte Action | General | Finalize and serve Plaintiffs' initial disclosures | 2.30 | |
| 01/10/17 | Annette Bruce | Del Monte Action | General | Revise CMC Statement based on Defendant's edits | 1.90 | |
| 01/11/17 | Annette Bruce | Del Monte Action | General | Attention to drafting opposition to motion to dismiss; research; outline | 10.90 | |
| 01/11/17 | Annette Bruce | Del Monte Action | General | Review and revise joint cmc; send to opposing counsel | 2.30 | |
| 01/12/17 | Annette Bruce | Del Monte Action | General | Revise CMC Statement; confer re motion to dismiss opposition | 3.70 | |
| 01/13/17 | Annette Bruce | Del Monte Action | General | Draft portions of opposition to motion to dismiss | 9.90 | |
| 01/16/17 | Annette Bruce | Del Monte Action | General | Draft and revise opposition to motion to dismiss; legal research | 12.70 | |
| 01/17/17 | Annette Bruce | Del Monte Action | General | Review and revise opposition to motion to dismiss; consider settlement frameworks | 7.10 | |
| 01/18/17 | Annette Bruce | Del Monte Action | General | Finalize opposition to motion to dismiss | 4.90 | |
| 01/19/17 | Annette Bruce | Del Monte Action | General | Finalize opposition to motion to dismiss | 3.90 | |
| 01/23/17 | Annette Bruce | Del Monte Action | General | Review and revise opposition; file opposition | 3.90 | |
| 01/24/17 | Annette Bruce | Del Monte Action | General | Correspond regarding discovery | 0.80 | |
| 01/26/17 | Annette Bruce | Del Monte Action | General | Correspond with opposing counsel and union counsel | 1.90 | |
| 01/31/17 | Annette Bruce | Del Monte Action | General | Review Del Monte's reply to opposition to motion to dismiss; prepare for oral argument | 2.90 | |
| 02/13/17 | Annette Bruce | Del Monte Action | General | Meet and confer re subpoena to Local 948; confer with client and opposing counsel | 3.90 | |
| 02/14/17 | Annette Bruce | Del Monte Action | General | Review and revise protective order; confer with counsel for Local 948 and clients; begin preparing for initial cmc and motion to dismiss hearing | 2.90 | |
| 02/15/17 | Annette Bruce | Del Monte Action | General | Confer with potential experts; review rates and proposals; review case law on statistical testimony; review papers related to CMC and hearing on motion to dismiss | 7.90 | |
| 02/15/17 | Annette Bruce | Del Monte Action | General | Travel to CMC | 2.90 | |
| 02/16/17 | Annette Bruce | Del Monte Action | General | Travel from CMC | 2.80 | |
| 02/16/17 | Annette Bruce | Del Monte Action | General | Attend hearing; speak with opposing counsel | 1.90 | |
| 02/25/17 | Annette Bruce | Del Monte Action | General | Travel to and from Hanford; meet with clients (Austin, Stewart, Gonzales, Herrera); correspond with clients | 8.90 | |
| 02/28/17 | Annette Bruce | Del Monte Action | General | Attention to drafting amended complaint | 7.40 | |
| 03/02/17 | Annette Bruce | Del Monte Action | General | Correspond with Local 948; attention to amending complaint | 2.90 | |
| 03/05/17 | Annette Bruce | Del Monte Action | General | Draft portions of revised complaint | 9.80 | |
| 03/07/17 | Annette Bruce | Del Monte Action | General | Speak with R. Raya and B. Austin; complete draft of amended complaint; review, revise and edit; review Del Monte's document production | 13.90 | |
| 03/08/17 | Annette Bruce | Del Monte Action | General | Finalize and file amended complaint | 3.90 | |

| | Client | Project | Task | Notes | Hours | Billed |
|---|---|---|---|---|---|---|
| 03/08/17 | Annette Bruce | Del Monte Action | General | Review case law and statutes concerning paid sick leave; draft LWDA notice re failure to provide sick leave to seasonal employees | 4.30 | |
| 03/09/17 | Annette Bruce | Del Monte Action | General | Confer with M. Herrera; revise LWDA letter | 3.30 | |
| 03/10/17 | Annette Bruce | Del Monte Action | General | Draft letter to LWDA re: seasonal employees | 3.80 | |
| 03/13/17 | Annette Bruce | Del Monte Action | General | Attention to PAGA issue re seasonal employees; correspond with D. Jacobson re: answer to complaint; correspond with expert re disparate impact analysis | 3.80 | |
| 03/14/17 | Annette Bruce | Del Monte Action | General | Draft letter to D. Jacobson re pre-mediation exchange of documents | 4.90 | |
| 03/15/17 | Annette Bruce | Del Monte Action | General | Correspond with expert | 0.60 | |
| 03/17/17 | Annette Bruce | Del Monte Action | General | Correspond with clients; finalize LWDA letter and letter to D. Jacobson | 1.80 | |
| 03/20/17 | Annette Bruce | Del Monte Action | General | Finalize LWDA notice; file LWDA notice and serve on Del Monte; send letter re: mediation requests | 3.90 | |
| 03/23/17 | Annette Bruce | Del Monte Action | General | Confer with client | 0.70 | |
| 03/27/17 | Annette Bruce | Del Monte Action | General | Correspond with opposing counsel and clients and expert | 2.30 | |
| 04/17/17 | Annette Bruce | Del Monte Action | General | Correspond with client and opposing counsel | 1.20 | |
| 04/19/17 | Annette Bruce | Del Monte Action | General | Correspond with client and review answer to complaint | 1.70 | |
| 05/07/17 | Annette Bruce | Del Monte Action | General | Correspond with clients and opposing counsel | 0.90 | |
| 05/08/17 | Annette Bruce | Del Monte Action | General | Correspond with client; review Mendoza v. Nordstrom opinion | 3.30 | |
| 05/15/17 | Annette Bruce | Del Monte Action | General | Correspond re third-party subpoena | 2.90 | |
| 05/16/17 | Annette Bruce | Del Monte Action | General | Correspond with clients and opposing counsel | 0.70 | |
| 05/24/17 | Annette Bruce | Del Monte Action | General | Correspond re mediation | 0.40 | |
| 05/31/17 | Annette Bruce | Del Monte Action | General | Call with clients; review Mendoza case and CBA cases; confer with counsel to Local 948 | 1.90 | |
| 06/01/17 | Annette Bruce | Del Monte Action | General | Review document production from Del Monte; calls with clients | 1.20 | |
| 06/02/17 | Annette Bruce | Del Monte Action | General | Prep for mediation; research case law; calls with clients; review data provided by Del Monte | 3.70 | |
| 06/06/17 | Annette Bruce | Del Monte Action | General | Research on relevant labor market for disparate impact; correspond with expert; call with clients; outline mediation statement | 5.70 | |
| 06/07/17 | Annette Bruce | Del Monte Action | General | Draft mediation statement; research various items | 6.50 | |
| 06/08/17 | Annette Bruce | Del Monte Action | General | Correspond with expert; continue drafting mediation statement | 2.90 | |
| 06/09/17 | Annette Bruce | Del Monte Action | General | Attention to mediation statement | 2.70 | |
| 06/12/17 | Annette Bruce | Del Monte Action | General | Review and revise mediation statement | 1.90 | |
| 06/13/17 | Annette Bruce | Del Monte Action | General | Send materials to client | 0.70 | |
| 06/14/17 | Annette Bruce | Del Monte Action | General | Review data from expert; correspond with expert; draft declaration for expert | 4.80 | |
| 06/16/17 | Annette Bruce | Del Monte Action | General | Revise mediation statement based on information from R. Drogin | 1.90 | |

| | Client | Project | Task | Notes | Hours | Billed |
|---|---|---|---|---|---|---|
| 06/22/17 | Annette Bruce | Del Monte Action | General | Correspond with client | 0.40 | |
| 06/23/17 | Annette Bruce | Del Monte Action | General | Calls with client and expert; revise mediation statement; review expert's revised data | 3.90 | |
| 06/26/17 | Annette Bruce | Del Monte Action | General | Correspond regarding third party subpoena | 0.90 | |
| 06/27/17 | Annette Bruce | Del Monte Action | General | Review Judge Donato's prior rulings in the class action context; draft pocket briefs on LMRA pre-emption and the duty of fair representation for use at the mediation; finalize draft mediation statement | 3.30 | |
| 06/28/17 | Annette Bruce | Del Monte Action | General | Finalize mediation statement for review with clients on 7/1 | 2.10 | |
| 06/30/17 | Annette Bruce | Del Monte Action | General | Finalize mediation statement; correspond with clients | 0.90 | |
| 07/01/17 | Annette Bruce | Del Monte Action | General | Travel to and from meeting with clients in Hanford; meet with clients in Hanford | 9.80 | |
| 07/04/17 | Annette Bruce | Del Monte Action | General | Compile final mediation statement; send to mediator and opposing counsel | 1.90 | |
| 07/17/17 | Annette Bruce | Del Monte Action | General | Correspond with clients and opposing counsel re mediation | 1.90 | |
| 07/20/17 | Annette Bruce | Del Monte Action | General | Travel to and from mediation; attend mediation | 14.90 | |
| 07/27/17 | Annette Bruce | Del Monte Action | General | Communicate with clients | 1.80 | |
| 07/28/17 | Annette Bruce | Del Monte Action | General | Attention to settlement of class action | 2.70 | |
| 08/01/17 | Annette Bruce | Del Monte Action | General | Travel to Hanford and Visalia and Lemoore; prepare documents for clients' review related to settlement; correspond with opposing counsel; calls with clients | 7.50 | |
| 08/04/17 | Annette Bruce | Del Monte Action | General | Correspond with opposing counsel and clients re settlement | 0.90 | |
| 08/10/17 | Annette Bruce | Del Monte Action | General | Travel to Hanford to meet A. Bruce; calls with D. Jacobson re settlement agreement | 5.90 | |
| 08/14/17 | Annette Bruce | Del Monte Action | General | Review and revise settlement agreement | 1.20 | |
| 08/18/17 | Annette Bruce | Del Monte Action | General | Finalize settlement agreement | 1.90 | |
| 08/28/17 | Annette Bruce | Del Monte Action | General | Correspond with opposing counsel regarding final settlement | 0.90 | |
| 08/30/17 | Annette Bruce | Del Monte Action | General | Correspond with opposing counsel; draft letters to clients | 2.20 | |
| 09/13/17 | Annette Bruce | Del Monte Action | General | Correspond re settlement | 0.40 | |
| 09/19/17 | Annette Bruce | Del Monte Action | General | Calls with clients and opposing counsel | 1.70 | |
| 09/24/17 | Annette Bruce | Del Monte Action | General | Draft letter to clients re withdrawal; prepare letter for mailing | 1.60 | |
| 10/09/17 | Annette Bruce | Del Monte Action | General | Correspond with Bryan Austin, Frank Gonzalez, Miguel Herrera, Raymond Raya and Derek Stewart regarding next steps in the case and their desire to dismiss their claims without prejudice | 1.40 | |
| 10/10/17 | Annette Bruce | Del Monte Action | General | Call with opposing counsel re Rule 41 dismissals | 0.20 | |
| 10/10/17 | Annette Bruce | Del Monte Action | General | Draft proposed dismissal of five of the plaintiffs' claims; send to opposing counsel | 1.90 | |
| 10/12/17 | Annette Bruce | Del Monte Action | General | Correspond with opposing counsel regarding dismissal | 0.40 | |
| 10/17/17 | Annette Bruce | Del Monte Action | General | Review and revise dismissal | 0.40 | |

Timesheet Details: Sebastian Miller

| | Client | Project | Task | Notes | Hours | Billed |
|---|---|---|---|---|---|---|
| 11/01/17 | Annette Bruce | Del Monte Action | General | Draft letter to clients re dismissal without prejudice; outline motion for approval of settlement | 2.30 | |
| 11/06/17 | Annette Bruce | Del Monte Action | General | Attention to motion for approval of settlement under PAGA | 3.70 | |
| 11/06/17 | Annette Bruce | Del Monte Action | General | Correspond with opposing attorney | 1.40 | |
| 11/16/17 | Annette Bruce | Del Monte Action | General | Correspond with opposing counsel | 0.90 | |
| 11/20/17 | Annette Bruce | Del Monte Action | General | Review materials provided by Del Monte; attention to approval papers | 2.90 | |
| 11/26/17 | Annette Bruce | Del Monte Action | General | Draft portions of approval papers | 4.30 | |
| 11/27/17 | Annette Bruce | Del Monte Action | General | Correspond with opposing counsel; draft portions of approval papers | 7.90 | |
| 11/30/17 | Annette Bruce | Del Monte Action | General | Attention to settlement agreement approval and related papers | 5.90 | |
| 12/01/17 | Annette Bruce | Del Monte Action | General | Finalize draft notice of motion and motion to approve settlement; send to opposing counsel per agreement | 1.90 | |
| 12/03/17 | Annette Bruce | Del Monte Action | General | Draft portions of declaration in support of approval of motion | 3.10 | |
| 12/04/17 | Annette Bruce | Del Monte Action | General | Correspond with opposing counsel | 0.80 | |
| 12/11/17 | Annette Bruce | Del Monte Action | General | Draft portions of declaration in support of approval of motion | 4.80 | |
| 12/12/17 | Annette Bruce | Del Monte Action | General | Revise declaration; compile exhibits; revise approval motion; revise proposed order | 9.90 | |
| 12/13/17 | Annette Bruce | Del Monte Action | General | Correspond with opposing counsel; draft proposed order; revise proposed order; revise other documents related to settlement approval | 4.80 | |
| 12/14/17 | Annette Bruce | Del Monte Action | General | Finalize and file settlement approval papers; upload them to LWDA website; file notice of upload with LWDA with the Court | 2.70 | |
| 12/21/17 | Annette Bruce | Del Monte Action | General | Review non-opposition; judge's calendar | 0.20 | |
| 01/16/18 | Annette Bruce | Del Monte Action | General | Prep for hearing in SF | 3.10 | |
| 01/17/18 | Annette Bruce | Del Monte Action | General | Further prep for hearing in sf | 1.80 | |
| 01/18/18 | Annette Bruce | Del Monte Action | General | Travel to and from hearing; appear for hearing; prepare for hearing | 9.80 | |
| 01/23/18 | Annette Bruce | Del Monte Action | General | Correspond with opposing counsel; draft notice re updates from LWDA | 2.70 | |
| 02/01/18 | Annette Bruce | Del Monte Action | General | Call with client; finalize settlement status report; efile report; send chambers copy | 0.90 | |
| 02/05/18 | Annette Bruce | Del Monte Action | General | Call with opposing counsel; attention to dismissal | 0.60 | |
| 02/07/18 | Annette Bruce | Del Monte Action | General | Correspond with opposing counsel | 0.60 | |
| 02/08/18 | Annette Bruce | Del Monte Action | General | Correspond with opposing counsel; draft dismissal and administrative motion to revise proposed order approving settlement | 2.60 | |
| 02/12/18 | Annette Bruce | Del Monte Action | General | Correspond re dismissal and administrative motion; file documents with Court and send chambers copies | 2.10 | |
| 03/08/18 | Annette Bruce | Del Monte Action | General | Call with client | 0.40 | |
| 03/13/18 | Annette Bruce | Del Monte Action | General | Call with opposing counsel; send email to courtroom deputy; review minute order; call with opposing counsel | 2.60 | |

|  | Client | Project | Task | Notes | Hours | Billed |
|---|---|---|---|---|---|---|
| 03/13/18 | Annette Bruce | Del Monte Action | General | Save template notice of motion, mpa, proposed order, declaration; draft proposed order | 4.30 | |
| 03/14/18 | Annette Bruce | Del Monte Action | General | Draft notice of motion; draft parts of MPA; case law research on attorney's fees; review costs and fees that were billed in 2018 | 5.60 | |
| 03/15/18 | Annette Bruce | Del Monte Action | General | Draft memo of points and authorities in support of attorney's fees motion | 6.80 | |
| 03/16/18 | Annette Bruce | Del Monte Action | General | Draft declaration in support of fees, costs and enhancement motion | 5.70 | |
| 03/16/18 | Annette Bruce | Del Monte Action | General | Conduct legal research on attorney's fees and enhancement and review Judge Donato's orders on those issues | 1.40 | |
| 03/19/18 | Annette Bruce | Del Monte Action | General | Call with opposing counsel; conduct additional research; review approval papers; revise settlement approval papers; prepare for filing; complete filing | 6.70 | |
| **Total** | | | | | **590.60** | |
| | | | | | | |
| **ALL TOTAL** | | | | | **590.60** | |

# EXHIBIT B

Sebastian Miller Law, P.C.
3785 Via Nona Marie, Suite 203E
Carmel CA  93923
United States

Annette Bruce

| Invoice # | 0000285 |
|---|---|
| Invoice Date | March 19, 2018 |
| **Balance Due (USD)** | **$180.55** |

| Item | Description | Unit Cost | Quantity | Line Total |
|---|---|---|---|---|
| Expense | [Del Monte Action 03/19/18] Printing: Print documents to review and edit in connection with approval motion | 10.00 | 1 | 10.00 |
| Expense | [Del Monte Action 03/19/18] Postage: Printing and postage for chambers copy | 20.00 | 1 | 20.00 |
| Expense | [Del Monte Action 02/13/18] Office Expenses & Postage: Chambers Copies USPS PO 0513140266 | 6.70 | 1 | 6.70 |
| Expense | [Del Monte Action 01/18/18] Travel: Travel to and from San Francisco for hearing; parking in San Francisco | 125.00 | 1 | 125.00 |
| Expense | [Del Monte Action 12/15/17] Office Expenses & Postage: Chambers Copy to District Court USPS PO 0569480201 | 18.85 | 1 | 18.85 |

| | |
|---|---|
| **Total** | **180.55** |
| Amount Paid | 0.00 |
| **Balance Due (USD)** | **$180.55** |

**Terms**
Thank you for your payment via check within thirty days of today's date.

This invoice was sent using 

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

# PAYMENT STUB

Sebastian Miller Law, P.C.
3785 Via Nona Marie, Suite 203E
Carmel CA  93923
United States

| | |
|---|---:|
| **Client** | Annette Bruce |
| **Invoice #** | 0000285 |
| **Invoice Date** | March 19, 2018 |
| **Balance Due (USD)** | $180.55 |
| **Amount Enclosed** | |

Sebastian Miller Law, P.C.
3785 Via Nona Marie, Suite 203E
Carmel CA  93923
United States

Annette Bruce

| | |
|---|---|
| Invoice # | 0000253 |
| Invoice Date | December 12, 2017 |
| **Balance Due (USD)** | **$13,141.96** |

| Item | Description | Unit Cost | Quantity | Line Total |
|---|---|---|---|---|
| Expense | [Del Monte Action 11/29/17] Printing: Print roughly 200 pages of paper related to editing approval papers | 30.00 | 1 | 30.00 |
| Expense | [Del Monte Action 08/30/17] Printing: Print five copies of settlement agreement (110 pages); send 5 letters to Hanford ($9) | 25.00 | 1 | 25.00 |
| Expense | [Del Monte Action 08/11/17] Travel: Travel to Hanford - reimbursement<br>ATM WITHDRAWAL 003313 08/1126378 CAR | 240.00 | 1 | 240.00 |
| Expense | [Del Monte Action 08/02/17] Travel: Travel to and from Hanford/Visalia/Lemoore and back to home following attempts to meet with clients and dropping off paperwork with each of them | 250.00 | 1 | 250.00 |
| Expense | [Del Monte Action 08/02/17] Printing: Print documents for clients | 15.00 | 1 | 15.00 |
| Expense | [Del Monte Action 07/24/17] Legal Fees: CHECK 1130 | 3,750.00 | 1 | 3,750.00 |
| Expense | [Del Monte Action 07/23/17] Restaurants/Dining: ILLY CAFFE SF 90 N | 3.38 | 1 | 3.38 |
| Expense | [Del Monte Action 07/21/17] Travel: Travel to San Francisco for mediation | 110.00 | 1 | 110.00 |
| Expense | [Del Monte Action 07/21/17] Taxi & Parking: SFMTA MOSCONE GARAGE | 16.00 | 1 | 16.00 |
| Expense | [Del Monte Action 07/01/17] Travel: Travel to meet with clients in advance of mediation | 210.00 | 1 | 210.00 |
| Expense | [Del Monte Action 06/21/17] Office Expenses & Postage: Mail documents to Bryan Austin<br>USPS KIOSK 0569489550 | 1.82 | 1 | 1.82 |
| Expense | [Del Monte Action 06/14/17] Printing: Print documents for client | 50.00 | 1 | 50.00 |
| Expense | [Del Monte Action 06/14/17] Office Expenses & Postage: Ship mediation statement<br>USPS PO 0513140266 | 13.60 | 1 | 13.60 |
| Expense | [Del Monte Action 06/06/17] Legal Fees: Mediation Fee CHECK 1159 | 7,000.00 | 1 | 7,000.00 |

| Item | Description | Unit Cost | Quantity | Line Total |
|------|-------------|----------:|---------:|-----------:|
| Expense | [Del Monte Action 03/09/17] Office Expenses & Postage: USPS PO 0569480201 | 6.65 | 1 | 6.65 |
| Expense | [Del Monte Action 03/07/17] Printing: Printing associated with first amended complaint and chambers copy and delivery of such | 100.00 | 1 | 100.00 |
| Expense | [Del Monte Action 02/17/17] Taxi & Parking: CCSF MTA IPS PRKNG METER | 1.00 | 1 | 1.00 |
| Expense | [Del Monte Action 02/17/17] Taxi & Parking: CCSF MTA IPS PRKNG METER | 2.25 | 1 | 2.25 |
| Expense | [Del Monte Action 02/15/17] Travel: Mileage to and from CMC | 160.00 | 1 | 160.00 |
| Expense | [Del Monte Action 02/15/17] Office Expenses & Postage: Print documents to prepare for CMC and motion to dismiss hearing | 50.00 | 1 | 50.00 |
| Expense | [Del Monte Action 01/20/17] Professional Services: Formatting for MTD Opposition TYPELAW.COM | 299.00 | 1 | 299.00 |
| Expense | [Del Monte Action 01/17/17] Printing: Printing for motion to dismiss; travel for legal research | 100.00 | 1 | 100.00 |
| Expense | [Del Monte Action 01/12/17] Legal Fees: Serve subpoena CHECK 1198 | 55.00 | 1 | 55.00 |
| Expense | [Del Monte Action 01/12/17] Office Expenses & Postage: Chambers Copy USPS KIOSK 0569489550 | 10.55 | 1 | 10.55 |
| Expense | [Del Monte Action 10/14/16] Office Expenses & Postage: Service of case initiating documents USPS 05131402634601526 | 13.97 | 1 | 13.97 |
| Expense | [Del Monte Action 10/13/16] Office Expenses & Postage: Printing and postage to serve chambers copy of complaint and case initiating documents on defendant | 20.00 | 1 | 20.00 |
| Expense | [Del Monte Action 10/13/16] Legal Fees: US DISTRICT COURT NDCA | 400.00 | 1 | 400.00 |
| Expense | [Del Monte Action 09/30/16] Mileage: Travel to Hanford | 200.00 | 1 | 200.00 |
| Expense | [Del Monte Action 08/17/16] Office Expenses & Postage: Serve notices of right to sue USPS 05694895523501497 | 1.36 | 1 | 1.36 |
| Expense | [Del Monte Action 08/08/16] Office Expenses & Postage: USPS 05694895523501497 | 1.57 | 1 | 1.57 |
| Expense | [Del Monte Action 08/08/16] Office Expenses & Postage: USPS 05694895523501497 | 4.24 | 1 | 4.24 |
| Expense | [Del Monte Action 07/31/16] Office Expenses & Postage: Fees to mail letter USPS 05694895523501497 | 1.57 | 1 | 1.57 |

| | |
|---|---|
| **Total** | **13,141.96** |
| Amount Paid | 0.00 |
| **Balance Due (USD)** | **$13,141.96** |

**Terms**

Thank you for your payment via check within thirty days of today's date.

This invoice was sent using **FRESHBOOKS**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

# PAYMENT STUB

Sebastian Miller Law, P.C.
3785 Via Nona Marie, Suite 203E
Carmel CA  93923
United States

| | |
|---|---|
| **Client** | Annette Bruce |
| **Invoice #** | 0000253 |
| **Invoice Date** | December 12, 2017 |
| **Balance Due (USD)** | $13,141.96 |
| **Amount Enclosed** | |

**DROGIN, KAKIGI & ASSOCIATES**
STATISTICAL CONSULTANTS

Richard Drogin, Ph.D.
Richard Kakigi, Ph.D.

www.dkstat.com
partners@dkstat.com

3104 Shattuck Avenue
Berkeley, CA 94705-1823

510-540-5071 (voice)
510-845-6011 (fax)

July  6, 2017

Mr. Sebastian Miller
Sebastian Miller LaW
900 Lafayette Street, Suite 201
Santa Clara, CA 95050

Dear Mr. Miller,

Enclosed is the bill for statistical consulting services performed
during the month of June 2017 in the Bruce v. Del Monte Foods
case.  Work includes loading and processing data files used to
compute paga amounts; prepare file summarizing time records
by week and month for each peson; check and correct calculations
of damages; discussions with counsel; maintain documentation.

| | | | |
|---|---|---|---|
| Consulting fee - Partners | 8.00 hours @ $300.00/hour | | 2400.00 |
| Staff Programmer | 9.00 hours @ $150.00/hour | | 1350.00 |
| | | TOTAL  $ | 3750.00 |

Sincerely,

Richard Drogin

# Mark S. Rudy, A Professional Corp.

351 California Street, Suite 700
San Francisco, California 94104
(415) 434-9800

Statement as of February 23, 2017
Statement No. 25055

Re: Matter ID - 11567-001
    Mediation Date - 7/20/2017
    Mediator - Mark S. Rudy, Esq.
    Bruce, et al. v. Del Monte Foods, Inc.

Sebastian L. Miller
Sebastian Miller Law, P.C.
900 Lafayette Street, Suite 201
Santa Clara, CA 95050

| 2/23/2017 | MSR | Mediation Fees | 0.00 | 0.00 | 14,000.00 |
|---|---|---|---|---|---|
| | | | Sub-total Fees: | | 14,000.00 |
| | | | Total Current Billing: | | 14,000.00 |

| Billing Party | % | Current Billing | Prior Balance | Total Now Due |
|---|---|---|---|---|
| Seyfarth Shaw, LLP | 50.00% | 7,000.00 | 0.00 | 7,000.00 |
| Sebastian Miller Law, P.C. | 50.00% | 7,000.00 | 0.00 | 7,000.00 |

**Each party is responsible for 1/2 of the mediation fees, unless otherwise agreed to by the parties.**

*PLEASE NOTE THAT ALL MEDIATION FEES ARE DUE FOUR
WEEKS PRIOR TO THE COMMENCEMENT OF THE MEDIATION.
IN THE EVENT THAT FEES HAVE NOT BEEN PAID BY EITHER
PARTY, THE MEDIATION WILL NOT GO FORWARD.*

**PLEASE MAKE CHECKS PAYABLE TO:
MARK S. RUDY, A PROFESSIONAL CORPORATION
Federal Tax I.D. Number 94-3010633**

# **EXHIBIT C**

LOS ANGELES DAILY JOURNAL

PERSPE

# An employee's rigl

By Sebastian Miller

**M**any exempt employees do at least *some* work on each day of a given week. Short of going into an office, they often work remotely, responding to emails, taking phone calls or using a laptop to perform other job duties. Few companies have instituted policies that prohibit this practice. However, an employer that "causes" any of its employees — even those who are exempt from overtime — to work for seven consecutive days may be exposed to large penalties and damages. A case pending before the 9th U.S. Circuit Court of Appeals may provide guidance on whether and when an employer "causes" an employee to work seven or more days in a row.

Labor Code Section 552 states: "No employer of labor shall cause his employees to work more than six days in seven." Unlike statutes concerning the payment of overtime wages or the provision of meal periods, Section 552 applies to exempt and nonexempt employees alike. Although the Industrial Welfare Commission had the authority under Labor Code Section 516 to exclude exempt employees from the ambit of Section 552, none of its wage orders do so.

A violation of Section 552 provides an aggrieved employee with the right to recover penalties under both Labor Code Section 558 (generally

$100 per pay period) and the Private Attorneys General Act (generally $200 per pay period). Additionally, an employee who did not work seven days a week and was fired for "not working hard enough" could ground a claim for wrongful termination on the policy underlying Section 552. A class of employees terminated by an employer who routinely asked them to work seven days a week might make a similar claim. Last, it is at least conceivable that employees who were not fired but still failed to receive promotions as a result of the employer's policies concerning consecutive days of work could seek underpaid wages pursuant to Section 558(a)(2).

Labor Code Section 554 does allow employers to require seven consecutive days of work in emergency situations or under a collective bargaining agreement. It also states that if the "nature of the employment reasonably requires that the employee work seven or more consecutive days" then an employer may comply by ensuring that "in each calendar month the employee receives days of rest equivalent to one day's rest in seven." But relying on this exception is a tenuous proposition because no court has provided meaningful guidance regarding whether the nature of a particular position "reasonably requires" that the employee work seven days in a row under Section 554.

An employer's best defense to a Section 552 claim may be that it did not "cause" an employee to work. This issue is before the 9th Circuit in *Mendoza v. Nordstrom Inc.*, 12-57130. Christopher Mendoza volunteered to take extra shifts as a nonexempt barista at Nordstrom's. As a result, he worked for seven days in a row.

Mendoza alleged Nordstrom "caused" him to work by placing informal pressures on him. His promotions were contingent on working extra shifts and his performance reviews spoke positively about his willingness to work beyond his scheduled hours.

But the district court rejected this theory of liability. It wrote that the term "cause" required some level of force or coercion and that Mendoza desired additional work and actively sought it out. Therefore, he was not

forced or coerced into accepting additional shifts.

The 9th Circuit has yet to rule, and it may not do so for some time. During oral arguments in December, the panel was understandably hesitant to decide issues of first impression concerning California law. The panel suggested it ought to certify those questions to the state Supreme Court. But, whether the 9th Circuit rules or the Supreme Court answers certified questions, there are several reasons *Mendoza* is unlikely to resolve all the issues that may come up in the context of exempt employees.

First, what it means to "cause" an employee to work may vary based on the employee's status as exempt or nonexempt. For instance, the informal pressures on advancement cited in *Mendoza* cited weigh more heavily on exempt employees who have defined promotional tracks within a company.

Similarly, *Mendoza* presented a stark contrast between working and not working. There, the plaintiff had to show up for a scheduled, eight-hour shift. More shades of grey appear when an exempt employee briefly responds to a few emails but otherwise takes the rest of the day off. Employers may argue that briefly responding to an email is a de minimis inconvenience and does not constitute a "day" of work.

Third, some employers may comply with Section 552 by allowing employees to take four days off per month rather than one day for every seven. This exception, however, only applies if the employee's position "reasonably requires" that the employee sometimes work for seven consecutive days. While many exempt employees must meet urgent, customer-imposed deadlines, work at a barista station rarely presents a similar need. Thus, *Mendoza* is unlikely to provide guidance on ﬦ.ﬦaning of "reasonably requires" within Section 554.

**Sebastian Miller** *is a solo practitioner in Santa Clara (www.sebastianm illerlaw.com). He worked in Biglaw for seven years before founding his current firm and now focuses on litigating employment claims on behalf of employees.*



**SEBASTIAN MILLER**
*Santa Clara*

# **EXHIBIT D**

# LAFFEY MATRIX

History

Case Law

Expert Opinions

See the Matrix

Contact us

Home

Links

| Year | Adjustmt Factor** | Paralegal/ Law Clerk | Years Out of Law School * | | | | |
|---|---|---|---|---|---|---|---|
| | | | 1-3 | 4-7 | 8-10 | 11-19 | 20 + |
| 6/01/17- 5/31/18 | 1.0463 | $196 | $359 | $440 | $636 | $717 | $864 |
| 6/01/16- 5/31/17 | 1.0369 | $187 | $343 | $421 | $608 | $685 | $826 |
| 6/01/15- 5/31/16 | 1.0089 | $180 | $331 | $406 | $586 | $661 | $796 |
| 6/01/14- 5/31/15 | 1.0235 | $179 | $328 | $402 | $581 | $655 | $789 |
| 6/01/13- 5/31/14 | 1.0244 | $175 | $320 | $393 | $567 | $640 | $771 |
| 6/01/12- 5/31/13 | 1.0258 | $170 | $312 | $383 | $554 | $625 | $753 |
| 6/01/11- 5/31/12 | 1.0352 | $166 | $305 | $374 | $540 | $609 | $734 |
| 6/01/10- 5/31/11 | 1.0337 | $161 | $294 | $361 | $522 | $589 | $709 |
| 6/01/09- 5/31/10 | 1.0220 | $155 | $285 | $349 | $505 | $569 | $686 |
| 6/01/08- 5/31/09 | 1.0399 | $152 | $279 | $342 | $494 | $557 | $671 |
| 6/01/07-5/31/08 | 1.0516 | $146 | $268 | $329 | $475 | $536 | $645 |
| 6/01/06-5/31/07 | 1.0256 | $139 | $255 | $313 | $452 | $509 | $614 |
| 6/1/05-5/31/06 | 1.0427 | $136 | $249 | $305 | $441 | $497 | $598 |
| 6/1/04-5/31/05 | 1.0455 | $130 | $239 | $293 | $423 | $476 | $574 |
| 6/1/03-6/1/04 | 1.0507 | $124 | $228 | $280 | $405 | $456 | $549 |
| 6/1/02-5/31/03 | 1.0727 | $118 | $217 | $267 | $385 | $434 | $522 |
| 6/1/01-5/31/02 | 1.0407 | $110 | $203 | $249 | $359 | $404 | $487 |
| 6/1/00-5/31/01 | 1.0529 | $106 | $195 | $239 | $345 | $388 | $468 |
| 6/1/99-5/31/00 | 1.0491 | $101 | $185 | $227 | $328 | $369 | $444 |
| 6/1/98-5/31/99 | 1.0439 | $96 | $176 | $216 | $312 | $352 | $424 |
| 6/1/97-5/31/98 | 1.0419 | $92 | $169 | $207 | $299 | $337 | $406 |
| 6/1/96-5/31/97 | 1.0396 | $88 | $162 | $198 | $287 | $323 | $389 |
| 6/1/95-5/31/96 | 1.032 | $85 | $155 | $191 | $276 | $311 | $375 |
| 6/1/94-5/31/95 | 1.0237 | $82 | $151 | $185 | $267 | $301 | $363 |

The methodology of calculation and benchmarking for this Updated Laffey Matrix has been approved in a number of cases. See, e.g., McDowell v. District of Columbia, Civ. A. No. 00-594 (RCL), LEXSEE 2001 U.S. Dist. LEXIS 8114 (D.D.C. June 4, 2001); Salazar v. Dist. of Col., 123 F.Supp.2d 8 (D.D.C. 2000).

* "Years Out of Law School" is calculated from June 1 of each year, when most law students graduate. "1-3" includes an attorney in his 1st, 2nd and 3rd years of practice, measured from date of graduation (June 1). "4-7" applies to attorneys in their 4th, 5th, 6th and 7th years of practice. An attorney who graduated in May 1996 would be in tier "1-3" from June 1, 1996 until May 31, 1999, would move into tier "4-7" on June 1, 1999, and tier "8-10" on June 1, 2003.

** The Adjustment Factor refers to the nation-wide Legal Services Component of the Consumer Price Index produced by the Bureau of Labor Statistics of the United States Department of Labor.

# **EXHIBIT E**

- [Search legal jobs](#)
- [Learn more about Law360](#)
- [Read testimonials](#)
- [Contact Law360](#)
- [Sign up for our newsletters](#)
- [Site Map](#)
- [Help](#)

What Do You Think About 3rd Party Litigation Funding?
[Take Our Survey](#)

<span style="color:red">Expert Analysis</span>

# 2 Routes To Hourly Rates For Lawyers

April 15, 2015, 4:43 PM EDT

Law360, New York (April 15, 2015, 4:43 PM EDT) -- A well-known problem with the hourly fee is that it may in some cases reward inefficient lawyers and create a misalignment between counsel and client. For years, some observers have argued that the hourly rate will die out and be replaced by alternative fee arrangements. This has not happened.

Sixty-seven percent of executives polled in a March 2015 Claims Litigation Management Advisors study anticipated no change in the use of AFAs over the next five years. Thus, the question remains: What is a reasonable hourly rate to apply for a lawyer's time?

Two sources have recently come into use that are very helpful in determining what former U.S. District Judge Vaughn Walker called an "objective source for setting [a variety of] counsel's hourly rates," without using data assembled from anecdotal reports or surveys by the lawyers, client or parties. They are the Real Rate Report and Laffey Matrix. I have no financial interest in either and find them both to be very helpful in my own practice.

Gerald G. Knapton

The Laffey Matrix is a free resource published each year by the U.S. Attorney's Office for the District of Columbia. The tiered rates to apply from May 2014 to June 2015 can be found [here](#) and are as follows:

| Experience | Rate |
| --- | --- |
| 20+ years | $520 |
| 11 -19 years | $460 |
| 8-10 years | $370 |
| 4-7 years | $300 |
| 1-3 years | $255 |

The various levels in the "Experience" column refer to the years following the attorney's graduation from law school and are intended to correspond to "junior associates" (i.e., one to three years after graduation), "senior associates" (i.e., four to seven years), "experienced federal court litigators" (i.e., eight to 10 years and 11 to 19

years) and "very experienced federal court litigators" (i.e., 20 years or more).

These rates are accepted in District of Columbia courts as one factor to consider when setting rates. Some courts in areas far away from the District of Columbia also use them, although some do not. It is agreed that there must be an adjustment to take the local cost of a lawyer's time into account. Some judges use the federal wages for judges to determine the relative costs for, say, San Francisco.

A simple way to do this that is very precise (and free) is to use federal wage data to establish San Francisco's average wage for lawyers compared to that for the District of Columbia.

The U.S. Bureau of Labor Statistics provides Occupational Employment Statistics in May of each year here. The report of interest is called "Metropolitan and nonmetropolitan area in either HTML or XLS versions." The relevant section is "May 2013 Metropolitan and Nonmetropolitan Area Occupational Employment and Wage Estimates."

This report has a section for every state. Each state has subreports for separate geographical areas. For California, there are 35 such areas. The one for our hypothetical is the San Francisco-San Mateo-Redwood City Metropolitan division.

There are 23 employment categories for most large geographical areas. In the "Legal Occupations" category, one finds median and mean hourly wage numbers for eight categories of legal worker, including lawyers. The mean hourly wage for them is $81.42 for May 2013, in San Francisco. The comparable data for the District of Columbia and the surrounding metropolitan division is $75.70. This is a 1.08 difference ($81.42/$75.70), so the District of Columbia rates must be adjusted up by 8 percent for San Francisco.

Here is the Laffey Matrix, as adjusted for current use in San Francisco:

| Experience | D.C. rate | S.F. rate |
|---|---|---|
| 20+ years | $520 | $562 |
| 11 -19 years | $460 | $497 |
| 8-10 years | $370 | $400 |
| 4-7 years | $300 | $324 |
| 1-3 years | $255 | $275 |

A similarly adjusted Laffey Matrix can be determined for almost any area in the country. Courts have agreed that the Laffey Matrix is one factor to consider in setting rates. It is a one-size-fits-all set of rates, so consulting a more granular set of data is also worthwhile.

There is now a commercially prepared set of data of actual rates that have been paid, called the Real Rate Report, which is published by Wolters Kluwer NV, an information, software and related corporate legal services company. This report was first released in 2012, and has been updated and improved in subsequent years.

The data used for the 2014 Real Rate Report includes more than $16.2 billion in fees billed for legal services in the U.S. during the seven-year period from 2007 to 2013. The data comprise fees paid by 90 companies to more than 5,600 law firms and more than 206,000 timekeepers. This dataset covers approximately 141,000 partners and associates spread across more than 350 U.S. metropolitan areas.

The rate data is presented in a wide variety of ways: high-level data cuts, industry analysis and practice area

analysis. Rates by timekeeper category are supplied for 59 cities. In-depth data for 10 large cities has been mapped to one of 12 practice areas, such as "Labor and Employment" and "Corporate," for example.

Following the example used in our discussion of the Laffey Matrix rates, it will be useful to examine the Real Rate Report's rates for legal work in San Francisco for general liability and also for labor litigation. Data for general liability in the report includes invoices paid for numerous practice areas, such as "Construction Defect" and "Mass Tort."

The 2014 Real Rate Report lays out the data showing the actual effect of a San Francisco law firm's size on partner and associate rates for general liability litigation. Here is the mean rate data for San Francisco:

| Firm size | Category | Mean |
|---|---|---|
| 50 or fewer | Partner | $277.53 |
| 50 or fewer | Associate | $192.74 |
| 51 to 200 | Partner | $335.88 |
| 51 to 200 | Associate | $204.00 |
| 201 to 500 | Partner | $364.90 |
| 201 to 500 | Associate | $347.03 |
| 501 to 1,000 | Partner | $645.21 |
| 501 to 1,000 | Associate | $440.00 |
| More than 1,000 | Partner | $575.65 |
| More than 1,000 | Associate | $415.44 |

Another frequent kind of litigation relates to employment. Data for labor and employment in the report includes invoices paid for numerous specific practice areas, such as "Compensation and Benefits" and "Employee Retirement Income Security Act."

The 2014 Real Rate Report data for labor and employment in San Francisco is this:

| Firm size | Category | Mean |
|---|---|---|
| 50 or fewer | Partner | $286.61 |
| 50 or fewer | Associate | $249.51 |
| 51 to 200 | Partner | $440.05 |
| 51 to 200 | Associate | $284.97 |
| 201 to 500 | Partner | $442.36 |
| 201 to 500 | Associate | $344.43 |
| 501 to 1,000 | Partner | $452.06 |
| 501 to 1,000 | Associate | $284.16 |
| More than 1,000 | Partner | $719.54 |
| More than 1,000 | Associate | $467.94 |

Here is an approximate comparison of the current range of rates for San Francisco from the two systems:

| Experience | Laffey | General | Labor |
|---|---|---|---|
| 20+ years | $562 | $645 | $720 |
| 11 -19 years | $497 | $575 | $452 |
| 8-10 years | $400 | $364 | $344 |
| 4-7 years | $324 | $204 | $284 |
| 1-3 years | $275 | $192 | $249 |

If we were developing a system to determine fees starting with a clean slate, we would price our professional services according to quality, efficiency and results. Tasks and team would be agreed upon. Instead, we have an hourly system that discourages tight management and can lead to padded bills and include time for work that may not have been necessary.

Under this hourly system determining what rate to apply can be challenging. In my experience reviewing legal rates, these two sources for rates are objective and reliable ways to gather reasonable hourly rate data on a vast number of geographical and practice areas. Because the hourly rate system seems likely to be with us for some time, it is important to refine it by determining reasonable rates and then to move on to a project management style of defining and controlling tasks, staffing and time.

—By Gerald G. Knapton, Ropers Majeski Kohn & Bentley PC

*Gerald Knapton is a partner in Ropers Majeski Kohn & Bentley's Los Angeles office. Knapton is chairman of the California State Bar's Committee on Mandatory Fee Arbitration.*

*The opinions expressed are those of the author(s) and do not necessarily reflect the views of the firm, its clients, or Portfolio Media Inc., or any of its or their respective affiliates. This article is for general information purposes and is not intended to be and should not be taken as legal advice.*

View comments



- Add to Briefcase
- Printable Version
- Rights/Reprints
- Editorial Contacts

## Related

**Sections**

- Aerospace & Defense
- Asset Management
- Automotive
- Banking
- Bankruptcy
- California
- Capital Markets
- Class Action
- Commercial Contracts
- Competition
- Consumer Protection
- Corporate
- Cybersecurity & Privacy
- Employment
- Energy
- Environmental
- Food & Beverage
- Government Contracts
- Health
- Hospitality